[Nos. 1178 and 1179.]

C. D. SHARP *v.* THE STATE.

1. RAPE—PRACTICE—EVIDENCE.—In a single count the indictment charged a rape effected by means of force and threats. *Held,* that the State could not be required to elect upon which of these means it would claim a conviction, nor be compelled to prove that the rape was accomplished by both means, separately considered.

2. SAME.—To establish a rape by force as defined by the Penal Code, it is necessary for the State to prove such force as may reasonably be supposed sufficient to overcome the resistance, taking into consideration the relative strength of the parties and other circumstances of the case; and to establish a rape by threats, the State must prove such a threat as might reasonably create a just fear of death or great bodily harm, in view of the relative condition of the parties as to health, strength and all other circumstances of the case. But, in establishing or determining the sufficiency of the force or the effect of the threat, when both are in proof, it is proper to consider the cogency which the threats may have contributed to the force, and the intensifying influence which the force may have imparted to the threat; and in such a case the trial court correctly refused to instruct the jury to ignore and disregard these considerations.

3. SAME.—Antecedent threats and former violence by the accused towards the female, calculated to subjugate her will to his, may be admissible in evidence for the State. See the facts of this case in illustration. Note also, the instructions given to the jury and *held* to be correct.

4. SAME.—Delay by a female in making complaint against her ravisher is a fact which sometimes casts strong suspicion upon her evidence against him. But it is a fact which may be explained by the other circumstances of the case, such as her age and helplessness, or his intimidation and brutality.

5. FACT CASE.—Note the evidence *held* sufficient in this case to sustain a capital conviction for rape, notwithstanding the protracted delay of the female in making disclosure of the outrage.

APPEALS from the District Court of Cooke. Tried below before the Hon. C. C. Potter.

On August 24, 1883, the grand jury of Cooke county presented two indictments against C. D. Sharp, the appellant. By the first it was charged that on the first day of February, 1883, he made a "violent and felonious assault upon one Emma Clark, and did then and there choke, beat and wound her, the said Emma Clark, and did then and there threaten to kill and to beat and whip her, the said Emma Clark, and did then and there, by means of said assaults and said threats, compel, force and intimidate her, the said Emma Clark, and did, by reason and by means of said force and threats and intimidation, rape, ravish, and carnally know her, the said Emma Clark, without her consent and against her will; contrary," etc.

By the other indictment it was charged that on January 25, 1883, the accused "did then and there unlawfully and feloniously make an assault upon one Amanda Clark, a female, and did then and there beat, whip, choke and wound her, the said Amanda Clark, and did then and there threaten to whip and

often beat and threatened them. He told them that if they told it the law would punish them, and he would go free. Witness never told the neighbors, because she was afraid to do so, until his beating got so bad that she was forced to, and then she slipped away to tell it. This was about a month ago. Witness did all the washing for the family, and noticed blood on Amanda's underclothing the first time the washing was done after Jeff. Sires left. The morning after witness heard Amanda crying in the night, witness asked her what was the matter. She would not then tell, but afterwards said that Sharp was bothering her.

Jeff. Sires, for the State, testified that he lived with the defendant in January, 1883, and was at defendant's when the reputed wife of the defendant died. The next night after her death, the defendant made Amanda and Emma both sleep with him, for the reason, as he told witness, that they were subject to fits. He said they were his children, and that he had married at fifteen. They were very much afraid of him, and continued to sleep with him while the witness remained there, which was for about two weeks after their mother's death. Defendant did not threaten the girls when he told them to sleep with him; he told them to pull off their clothes and get in bed right.

Mr. Sanders, for the State, testified that during the preceding winter he worked one day for the defendant. The defendant and Amanda were working near the witness, when defendant became angry at Amanda and struck her in the face with his fist, knocked her down, and when she got up he kicked her in the stomach and told her he would stamp her haslets out. The girl seemed very much scared.

With this testimony, the prosecution closed its evidence in chief in the trial for the rape of Amanda Clark.

Mrs. Johnson was the first witness for the defense. She testified that she lived about three miles from the defendant, and that his family had visited witness's often since the death of his reputed wife. Witness attended Mrs. Sharp during part of her last illness, and since her death had been a confidential friend to the girls. Witness talked with them about their home matters. They always reported everything as going on all right, and seemed very affectionate toward the defendant. They would climb on him and caress him, and express great affection for him. They never seemed the least bit afraid of him.

Sam. Johnson, for the defense, testified that he worked two

days for the defendant since the death of the latter's reputed wife. Sharp, the defendant, seemed very kind to the girls. They visited at witness's with Sharp since · their mother died, and seemed very fond of Sharp. Witness never heard Sharp use profane language.

Andy Beer, for the defense, testified that he had worked two days for the defendant since the death of the mother of the girls, Emma and Amanda. The girls seemed very friendly toward defendant, and laughed and joked with defendant, seeming not at all afraid of him.

The foregoing constitutes the evidence in the case for the rape of Amanda, the younger sister, wherein the penalty of death was assessed against the appellant. His counsel excepted to the indictment as duplicitous in charging the rape to have been effected by both force and threats. Numerous exceptions were reserved by the defense to portions of the testimony for the State, and particularly to the admission of the proof respecting the defendant's treatment of the girls on other occasions than the inculpatory acts imputed to him. A series of special instructions, emphasizing the positions of defendant's counsel, were asked of the court. Motions for new trial and in arrest of judgment were entered and insisted on. The court below having overruled the various exceptions and motions of the defense, the defense appealed.

The proceedings in the trial for the rape of Emma were substantially the same as those above outlined.

*Barrett & Dougherty*, for the appellant: The indictment alleges that the rape was effected by force and by threats. It does not use the exact words of the statute in charging the force, but the words employed are equivalent. It alleges that appellant made an unlawful and felonious assault upon the said Amanda Clark, and that he did beat, choke and wound the said Amanda, and that he did threaten to whip, beat and kill the said Amanda, and concludes by charging "that he, the said Sharp, did then and there, by means of said assaults and said threats, rape, ravish and carnally know her, the said Amanda Clark, without her consent and against her will." These allegations clearly charge rape by force. (*Williams* v. *The State*, 1 Texas Ct. App., 90; *Walling* v. *The State*, 7 Texas Ct. App., 625; *O'Rourke* v. *The State*, 8 Texas Ct. App., 70; *Gutierrez* v. *The State*, 44 Texas, 587; *Robertson* v. *The State*, 31 Texas, 36.)

This being the case, and the evidence tending to show that the rape (if there was any) was accomplished by force as well as by threats, it became all-important that the jury should have been informed as to the nature and degree of force requisite to the commission of such offense. The court, whether requested or not, should have clearly explained to the jury that the force used by appellant "must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case." (Art. 529, Penal Code; *Jenkins* v. *The State*, 1 Texas Ct. App., 346; *Jones* v. *The State*, 10 Texas Ct. App., 552.) No attempt was made in the charge of the court to enlighten the jury upon this vital issue. But, instead of this, the court proceeded upon the hypothesis that a mere assault (which, as it was defined to the jury, might be committed without even an intent to injure) was equivalent, as a means of accomplishing rape, to the statutory degree of force necessary to the perpetration of that crime.

If we are correct in the position that the indictment charges rape committed by a combination of force and threats, then, in order to warrant a conviction, both force and threats must be proved, and both must come up to the legal standard. A rape committed in any other way, or by either of these methods alone, will not suffice. According to the testimony of the witness Amanda, the rape was principally effected by threats. Yet from her own statement, there was some force. After detailing what transpired between herself and appellant on the first and second nights after Jeff. Sires left their house, she says: "And on the third night, he got on top of me, and pulled my legs open." Again she says: "I made no resistance more than try to get from under him." "I did not offer more resistance because I knew he would kill me if I did." Then, according to her testimony, appellant used some force. Was he not entitled upon the trial of an issue fraught with such momentous consequences to him, to have the opinion of the jury as to the sufficiency of such force?

In the next place we think the court erred in admitting evidence of violence and threats by appellant, upon the said Amanda and the other members of her family, prior to and since the alleged rape. (2 Bishop Crim. Proc., sec. 970; *People* v. *Tyler*, 36 California, 522.) This testimony was introduced over appellant's objection. The fact that a man has often beaten

a woman, and has frequently threatened to take her life or to do her great bodily injury, will not make him guilty of rape, if he afterward have carnal knowledge of her; nor will it amount to the degree of force or to the character of threat that must be used at the very time of the carnal intercourse to constitute rape; neither will it excuse her from making that amount of resistance which the law imposes upon every woman in defense of her chastity. This testimony was calculated to influence the minds of the jury to such an extent as to endanger appellant's chances for a fair and impartial trial. But suppose it was admissible, we then think it beyond dispute that the only purpose for which it could be introduced was to aid the jury in arriving at a proper conclusion as to whether the force and threats employed in effecting the rape, at the very time of its commission, came up to the legal standard—such evidence constituting a portion of the "other circumstances of the case" that the jury ought to consider in making their verdict; and for the further purpose of accounting for the failure of the said Amanda to make immediate outcry, thereby relieving her testimony of a just ground of suspicion. If this rendered the testimony admissible, then we think it devolved upon the court below, by an appropriate instruction, to carefully explain to the jury the scope of this testimony and to guard them against its misapplication. In all felony cases it is the duty of the court, whether asked or not, to deliver to the jury a written charge, which shall distinctly set forth the law applicable to the case. (Code Crim. Proc., sec. 677.) This means all the law applicable to the case, and to every issue legitimately deducible from the evidence. (*Reynolds* v. *The State,* 8 Texas Ct. App., 414; *Heath* v. *The State,* 7 Texas Ct. App., 464; *Marshall* v. *The State,* 40 Texas, 200; *Darnell* v. *The State,* 43 Texas, 147.)

In *Collins* v. *The State,* 5 Court of Appeals, 40, which was a prosecution for aggravated assault and battery, the testimony showed that defendant had committed another offense besides the one for which he was being tried. To guard against the improper influences of the evidence showing such other offense, he requested the following charge, viz: "No testimony of a former alleged offense by defendant can be taken into consideration in arriving at a verdict in this case." This instruction being refused, upon appeal, this court said: "We are of opinion, after examination of the evidence as disclosed by the statement of facts, that this was a proper instruction, and that the court erred

in refusing it." In view of all the facts of this case, ought not the court below to have guarded the rights of appellant by an appropriate instruction upon this point? The failure to afford him this protection was calculated to withdraw the mind of the jury from the real issue in the case, and to mislead them into the belief that former violence and threats by appellant toward the said Amanda would make carnal intercourse with her rape, without reference to the degree of force or the nature of threats employed at the very time of such intercourse. Besides, the failure of the court to explain to the jury the only purposes for which they could consider this testimony enabled the State to put in issue appellant's character as a violent and cruel man. What could not be done directly was thus indirectly accomplished. The jury, in making up their verdict, were not confined to the isolated question, whether appellant, by means of force and threats, in and of themselves sufficient to accomplish rape, had carnal knowledge of the said Amanda, without her consent; but by the general scope of the evidence and the failure of the judge to limit it to its proper application, they were invited to go beyond the real point of inquiry—the sufficiency of the force and threats—and call to their assistance in forming a conclusion as to appellant's guilt or innocence, his character as an overbearing, wicked and cruel man. They saw from the evidence that he was the destroyer of domestic happiness; that he had put himself in the place of father and protector; that, instead of acting the part of a kind and indulgent parent, as he had assumed to do, he had played the role of the tyrant. Thus it will appear how important it was that he should have been protected by an appropriate instruction against the prejudices that evidence of this character would naturally and inevitably create in the minds of the jury.

But, when we come to review the testimony in this case, and to test its genuineness in the crucible of truth, we believe it falls short of that degree of certainty so essential in prosecutions resulting in depriving the accused of his life. There is an inherent unreasonableness in the testimony of the witness Amanda Clark that challenges the credulity of the most confiding. Upon the first night after Jeff. Sires left their house, while she and appellant were alone in bed, she says he undertook to have forcible connection with her. Not a word of solicitation was uttered by him, nor the slightest effort made to obtain her consent before resorting to force. This strikes us as unreasonable. If

true, it is indicative of a state of degredation far below that of the meanest of the brute creation. But it cannot be true. It is absurd to say that he resorted to force without first having failed at persuasion. He would have endeavored by argument to convince her that to yield to his desires was not wrong. If he was actuated by a determination to ravish her, why did he not do it on the first night? Why did he fail on the second night? She made no more resistance on these nights than she did on the third, when, she says, the rape was committed. It is true, she says on the first and second nights she lay on her side, while on the third night she lay on her back, but if the latter position was more favorable to the accomplishment of his design than the for.ner, if her testimony as to her implicit obedience to his commands is to be believed, he 'ad only to give the order and she would have assumed the de., 'd position. If he was determine.l to have carnal knowledge of h,r, regardless of her consent, having her in complete subje·-ion, as s'e testifies, would he have delayed the accomplishment of his purpose until the third night after its inception, merely repeating on the second night the *quasi* force and threats he employed on the first? Would he, inflamed, as he must have been, by sexual desires, have divided the base deed into sections, making it the work of three successive nights? Would he not at once have perpetrated the villainous act?

There is a striking resemblance, externally, between an attempt to commit rape and an indecent and lascivious familiarity with a female with an intent only to induce her, over a modest degree of resistance, to consent to sexual intercourse. The woman may honestly believe the graver act was intended, when, in reality, the other was all that was designed. Her misconception, however, would not make the man guilty of anything more than he really intended. To ascertain his intent, then, would' be a matter of prime importance in arriving at a just conclusion as to the degree of his guilt. We cannot reconcile the testimony of the witness Amanda Clark as to what occurred between herself and appellant on the first three nights after Jeff. Sires left their house, with a determined and fixed purpose on his part to have carnal knowledge of her, regardless of her consent. Her nonconsent, that she testifies to, was like that of the virtuous Julia, striving to free herself from the lustful grasp of the wicked Juan, who, while vowing with her last, faint resistance, "I will ne'er consent"—consented. That she should have consented is

by no means improbable.   Upon the contrary, in the light of all
the  surrounding  circumstances,  it  was  reasonable  and  in  the
very nature of things that she should.   She had seen her mother
renounce her marriage vows to her lawful husband for the adul-
terous society of appellant.   For two years she had seen her liv-
ing in a perpetual state of  shame and adultery.   A mother's ex-
ample, whether for good or evil, impresses itself so firmly upon
her daughters that they can never be freed from its influences.
What girl, at the age of thirteen years, could think that her
mother had ever done wrong?   Or that she need refrain from
doing anything that, by a perpetual example for two years, her
mother had taught her was right?

   In  addition  to  this,  her  failure  to make outcry  for  so long a
time after the alleged rape renders her testimony too doubtful
and too suspicious to form the basis of a result so awful as a ju-
dicial deprivation of human life.   The law looks with just sus-
picion upon the story of a woman who fails to make immediate
complaint against the robber of her virtue.   (Wharton's Crim.
Ev., sec. 273; 2 Bishop Crim. Proc., sec. 969; Wharton's Crim.
Law, sec. 565; *Rogers* v. *The State*, 1 Texas Ct. App., 187; *Tapo-
lanck* v. *The State*, 40 Texas, 160.)   So intrinsically weak and
unsatisfactory does it regard such testimony, it has provided by
way of limitation that no indictment for rape shall be presented
after one year from the commission of the offense.   We do not
deny that the failure to make outcry can be explained, and thus
to some extent relieve her testimony of suspicion.   But the ex-
planation must be reasonable.   In *Tapolanck* v. *The State,* 40
Texas, 160, defendant was convicted upon the sole testimony of
the injured party.   Her testimony of the force and violence
employed by defendant in the commission of the offense, and
of her laborious resistance, was full and complete; but she
failed to make any disclosure of the crime for about three
months after its commission.   The explanation of her silence—
that Tapolanck threatened, in case she told it, to take her life,
her father's, and then his own—was properly regarded by our
Supreme Court as too weak to restore her testimony to credi-
bility.   In the case at bar, the failure to make outcry was de-
layed for six or seven months.   The explanation of this delay,
as given by the witnesses Emma and Amanda Clark—that ap-
pellant frequently beat them, and threatened to kill them, and
said that the law would punish them and exonerate him, in case
it became known—is neither reasonable nor satisfactory.   Even

if they believed appellant was determined in his threats, they had every assurance of receiving ample protection from their neighbors, for they were already interesting themselves in behalf of these witnesses and the other children. Amanda says "when we were hoeing cotton, last spring, the neighbors told us to complain to them if he abused us."

If the neighbors voluntarily offered them protection against his whipping the children, would they not much more readily have come to their rescue if they had been informed he was outraging these girls? And is it not too great a strain upon human credulity to believe that they had any fear of not receiving protection at the hands of their neighbors? Why is it, when they did resolve to complain of appellant's conduct, they did not tell of his outraging them, instead of whipping the children? According to their testimony he had been raping them ever since their mother died. And though they had the assurance of their neighbors that they would be protected against his cruelty, it never occurred to them to tell of this until about one month previous to the trial in the court below.

*William Windsor, Jr.*, also for appellant, filed an able and forcible brief and argument, in which the principal proposition relied on for a reversal is formulated in the terms quoted in the opinion of this court.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE.—On the fourth day of September, A. D. 1883, appellant was placed on trial for the rape of Emma Clark, and was found guilty, with fifty years confinement in the penitentiary as the punishment.

On the seventh day of the same month appellant was tried for the rape of Amanda Clark, and found guilty, the jury assessing the death penalty.

From the judgments rendered on these verdicts the appellant brings the causes to this court by appeal.

Emma and Amanda Clark are sisters. At the time of the supposed rape of Emma she was about fifteen years old; and at the time of the rape on Amanda, she was thirteen years of age.

In almost all of the legal aspects, these causes, as presented by the record, are similar. They differ in the ages of the girls, and in the fact that there was evidence tending to show greater

force in the Emma case; and the charge of the court in the Emma case contains instructions relative to both the means by which the rape is alleged to have been effected, while that in the Amanda case seeks to confine the jury to threats only. The indictments allege that the rapes were effected by *force and threats*. All of the questions raised in the first case are presented in the last, and hence a disposition of the last will dispose of the first.

The means used to effect the rape is alleged by the indictment to have been *force* and *threats*. These means are set forth in the same count, there being but one count in the indictment. Defendant moved that the State be required to elect upon which of the means a conviction would be claimed. This being denied, the defendant then claimed that the State was bound to establish both.

Appellant is not correct in either of these propositions. The rule upon this subject will be found in section 585, Bishop's Criminal Procedure, third edition. The rule in this section has its qualification in section 587. This case does not come within the qualification contained in the last section.

The vital proposition—that which was urged with such ability and learning in argument and brief, by counsel for appellant—is: "That rape cannot be effected, under our Code, by a *combination* of force and threats, unless the force, considered separately, is such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties, and other circumstances of the case; or unless the threat, considered separately, be such as might reasonably create a just fear of death or great bodily harm, in view of the relative condition of the parties as to health, strength, and all other circumstances of the case."

At first view this is quite a plausible proposition; but upon closer inspection we find the proposition ensconced behind another, the solution of which will determine that of appellant. And we believe the bare statement of the true question will demonstrate the deformity or unsoundness of appellant's.

While it is true that the *force* used must be such as might reasonably be supposed sufficient to overcome the resistance, and that this fact must be established by the State, and while it is also true (threats being the means relied on) that the threats must be such as might reasonably create a just fear of death or great bodily harm (and this fact must be shown by the State),

still, this proposition, this vital question, which lies in front of the one presented by defendant, is submitted: Can threats made by defendant, though not sufficient in themselves, so characterize or give meaning to force—the force not being within itself sufficient—as to render it sufficient to overcome resistance? Again, can force used by defendant, though not sufficient, separately considered, so characterize and intensify threats—the threats not being, sufficient, separately considered—as to constitute the threats such as are likely to create a just fear of death or great bodily harm?

Under the provisions of our Code defining rape, we must answer these questions in the affirmative.

When the force is considered, the threats, whether made prior to or at the time, can and should be looked to; for they so commingle with and inhere in the force as to be a part thereof. And just so with regard to the effect given to threats by the force.

We are not required to go to common law principles for light upon this subject; for our Code, which is in strict accord with reason and common sense, expressly provides that in considering the sufficiency of the force. not only the relative strength of parties may be looked to, but the other circumstances of the case. And, in considering the sufficiency of the threats, the relative condition of the parties as to health, strength, and all other circumstances of the case, should be taken into consideration.

The learned counsel for the defendant, relying upon the correctness of the proposition stated by him above, endeavored to make it practicable by so shaping the charge as to embrace the principles contained in his proposition, and by objecting to all evidence tending to show antecedent threats or force used at former times and places. We do not believe that the court, in its charge, should have confined the jury (in considering the sufficiency of the force) to the force used at the time, considered separate and independent of former or accompanying threats, and so have treated the threats independently.

The next question presented for a determination is this: "Were former threats against the girls, violent and brutal assaults and batteries, which tended to subjugate the wills of the girls to that of the appellant, admissible?" Upon the clearest principles of right and justice, as well as by that provision of the Code which expressly authorizes the jury to look to and consider health and strength, *and all other circumstances of the case.* Law should be founded upon reason and common sense. Would

any rational man believe that it would require the same charac-ter of force or threats to overcome resistance, or produce just cause for fear of death or great bodily harm, in a case in which the defendant had, by a course of brutal terrorism, completely subjugated the will of his victim, that it would in a case where the parties were on something like an equal footing—a case in which such control had not been acquired ? In the cases at bar the girls were very young—one being only thirteen years old—and for days and months they had been the subjects, not only of threats, but of the most brutal treatment, especially the younger girl, Amanda. Can it be questioned that by such treatment the will of this girl, yea of either, may not have been effectually crushed, and her acts made to conform to the defendant's com-mands, unaccompanied by either force or threats ?

We are of the opinion that the former conduct of the defend-ant toward these girls was properly admitted in evidence.

In the case for the rape of Emma Clark, the learned judge who presided on the trial instructed the jury fully the law ap-plicable to both means, to-wit, *force* and *threats*. But in the case of the rape of Amanda, the charge confined the jury to the threats as the means by which the rape was effected. Counsel for defendant insists that this was not the case, and that there was given to the jury the right to convict defendant of rape by *force;* and that, as the charge failed to inform the jury of the nature of the required force, it was erroneous.

If this be true, namely, that the jury were authorized by the charge to convict defendant of rape *by force,* evidently the charge of the court was defective, and the judgment must be reversed. What, then, did the court charge the jury upon this subject? This: "1. If you believe from the evidence in this case, beyond a reasonable doubt, that the defendant, C. D. Sharp, in Cooke county, Texas, on any day prior to and within one year of the twenty-fourth of August, 1883, did make an unlawful assault upon one Amanda Clark, and by means of said assault, and by means of threats then made by defendant toward and against the said Amanda Clark, did then and there carnally know and ravish her, the said Amanda Clark, against her will and without her consent, you will find him guilty, and assess his punishment at death, or confinement in the peniten-tiary for life, or for any term of years not less than five.

"2. The use of any unlawful violence upon the person of another, whatever be the means or degree of violence used, is

an assault and battery. Any attempt to commit a battery, or any threatening gesture showing in itself, or by words accompanying it, an immediate intention, coupled with an ability to commit a battery, is an assault. The injury intended in the above definition of an assault may be either bodily pain, constraint, a sense of shame, or other disagreeable emotion of the mind.

" 3. The threats mentioned in the first section of these instructions, by which a rape may be effected, must be such as might reasonably create a just fear of death or great bodily harm in the mind of the female, in view of the relative condition of the parties as to health, strength, and all other circumstances of the case."

It is evident from an inspection of this charge that there was no attempt to inform the jury of what character of force was necessary to effect rape by that means; and if, as above stated, the jury were permitted by the charge to convict the defendant of rape *by force*, this was error. By a long line of decisions the charge should be confined to the case as made by the evidence. Now, suppose that the evidence presented a case in which rape may have been effected by *both means*, and the charge confined the jury to but one means, can the defendant complain? Certainly not. But suppose there be some evidence tending to present a case in which the rape may have been effected by both, and the court should charge the law correctly as to one and incorrectly as to the other, the charge being so framed as to authorize the jury to convict of rape by *either means;* this unquestionably would be error.

But suppose, as in this case, the jury are confined to threats as the means, and the law applicable to this means is fully charged, and, in addition to the threats, the jury by the charge are required to believe that, to effect the rape, in connection with the means, the defendant must have made an assault and battery upon the girl, would this be error? We think not; for the simple reason that, whether the rape be effected by force or threats, there must be an assault and battery. If this is not the case, the jury were required by the charge to believe, before they could convict, more than was required by law. But it is physically impossible to commit rape by any means without at the same time committing assault and battery. We are of the opinion that there is no error in the charge.

Appellant insists that the verdict is not supported by the evidence, and in support of this assignment urges the fact that the girls made no manner of complaint until some two or three weeks had expired. In some cases this fact would cast very strong suspicion on the case; in fact, if there was not a very solid reason in explanation of this failure to disclose, the jury should not convict, especially if a conviction be sought alone upon the evidence of the prosecutrix. But in the cases in hand, if these girls are worthy of credit, very full, clear and reasonable explanation is made why they, or either of them, did not divulge this matter sooner.

By a long course of threats and personal violence, these girls, of tender years, were brought almost completely in subjection to the will of the defendant. To him they occupied the same relation as that of a slave to a cruel and unmerciful master. His command, to such an extent did they fear and dread him, was the law to them. Nor was this awe and fear of defendant wanting in foundation; for these girls, by a long and terrible experience, had been taught that when defendant spoke he was in earnest, and woe to them if they disobeyed. Not only so; defendant, after the rape, threatened them, if they should divulge, not only with personal violence, but told them that the law would punish them, and would not punish him. Looking, then, to their ages, condition in life, the relation of the parties, and adding to these the brutal treatment of defendant, can it be wondered at that these slaves, in fact, of defendant did not sooner disclose this terrible crime? When, however, defendant had been arrested upon another charge, and was locked up in jail, they promptly disclosed the crime.

We have given this record our most careful attention, and, while we have not discussed all of the grounds relied upon for a reversal of the judgment, we have failed to find such error as will warrant us in reversing the judgment.

We feel that we cannot conclude this opinion without some allusion to the manner and ability in which this man has been defended. From the commencement to the end of this record, the character of the fearless, prudent and able counsel is exhibited. In brief and argument these traits are well presented, and the unfortunate defendant cannot, upon the terrible day of his execution, lay any blame at the feet of his counsel.

If this poor wretch is not guilty, perjury of deepest and most

terrible character has prevailed; for if these girls spoke the truth the jury could have rendered no other verdict than guilty.

Finding no error, we are constrained to affirm these judgments.

*Affirmed.*